UNITED STATES of America, Appellee,

v.

James J. ARMSTRONG, Appellant.

UNITED STATES of America, Appellee,

v.

James L. KUHN, Appellant.

UNITED STATES of America, Appellee,

v.

James L. KUHN, Appellant.

Nos. 93–1483, 93–1485 and 93–1486.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 15, 1993.

Decided Feb. 10, 1994.

Counsel who presented argument on behalf of the appellant was James F. Margadant of Rapid City, South Dakota, for Armstrong and Dave L. Claggett of Spearfish, South Dakota, for Kuhn.

Counsel who presented argument on behalf of the appellee was Steven Douglas Rich, Assistant U.S. Attorney, of Rapid City, South Dakota.

Before MAGILL, Circuit Judge, HEANEY, Senior Circuit Judge, and HANSEN, Circuit Judge.

HEANEY, Senior Circuit Judge.

James J. Armstrong and James L. Kuhn were convicted by a jury of uttering and conspiring to utter counterfeit obligations in violation of 18 U.S.C. §§ 472 and 371. Kuhn

was also convicted of possessing counterfeit obligations with intent to defraud in violation of 18 U.S.C. § 472. Additionally, Kuhn was charged with possessing an unregistered firearm in violation of 26 U.S.C. §§ 5841, 5861(e), and 5871, to which he pleaded guilty after reserving the right to appeal the district court's denial of his suppression motion. Armstrong was sentenced to eight months imprisonment and Kuhn to twenty-four months. Both appeal their convictions and we affirm.

## I.

On June 29, 1992, Armstrong and Kuhn left New York by motorcycle for a trip to Kuhn's family reunion at a state park outside of Omaha, Nebraska. They were accompanied by Dean Kruger, who was not prosecuted by the government. The three agreed to put $250 each into a common pot that would be managed by Kuhn to cover gasoline, campground fees, groceries, and other group expenses. Each agreed to carry additional funds to cover personal items, such as, cigarettes, drinks, and souvenirs.

The defendants and Kruger arrived at the site of Kuhn's family reunion on July 2, and, following the reunion, three days later travelled north to the Black Hills of South Dakota. They toured the Black Hills for a couple of days and on July 7 decided to return to New York because of continuing mechanical problems with their motorcycles. On route home, they stopped off at Wall, South Dakota, a popular tourist spot.

Upon arriving in Wall, the three agreed to go their separate ways and meet back in an hour. Armstrong made his way down Main Street and stopped at the Wildlife Museum, where he purchased an ice cream. He then crossed the street and entered the Buffalo Gift Shop. Upon leaving the gift shop, he saw Kuhn going into the Wildlife Museum. He re-crossed the street and joined Kuhn inside the museum, where he purchased several souvenirs and a drink.

Armstrong and Kuhn decided to get something to eat, and were directed to Madre's Pizza and the Wall Dairy Queen nearby. The pair went to Madre's, where each ordered a slice of pizza, tendering two $20 bills. They then walked to the Dairy Queen. Kuhn stepped up to the till manned by Nancy Holub, the owner's wife, and ordered a hot dog, costing $1.27, that he paid for using a $20 bill. Holub thought that the $20 bill tendered by Kuhn "felt funny," Tr. at 7, but accepted it anyway and gave Kuhn his change and order number. Armstrong stepped up next and ordered a hamburger, costing $1.59. He also paid for his purchase with a $20 bill. Holub thought that this bill also felt funny, examined it, and asked Armstrong if he had the correct change. He replied that he did not.

Holub had previously received training in recognizing counterfeit money and, believing both $20 bills to be counterfeit, left the till and called Wall Police Chief Jerry Miller. Miller advised her to take the bills to the bank. Bank employees confirmed that the bills, which had identical serial numbers, were counterfeit. Holub brought the bills to Miller and both returned to the Dairy Queen to locate the defendants. Neither, however, could be found. Suspecting that the defendants were on foot and still in the area, Miller and Holub drove around Wall looking for the pair.

In the meantime, Armstrong and Kuhn left the Dairy Queen and ventured back down Main Street. They entered Gamble's Hardware store, where Armstrong purchased $1.37 worth of repair items for his motorcycle. He handed the clerk, Selina McGriff, a $20 bill. Believing something to be strange about the bill, McGriff said aloud, "Boy, this feels odd," Tr. at 124, whereupon Armstrong reached for the bill, took it back, and produced the correct change.

Shortly thereafter, Holub spotted Kuhn riding his motorcycle and shouted to Chief Miller, who was across the street, that Kuhn was one of the men who passed one of the counterfeit $20 bills. The two followed Kuhn in Miller's car and stopped him. Miller asked Kuhn if he had eaten anything at the Dairy Queen and if he had paid for his purchase with a $20 bill. Kuhn answered "yes" to both questions. *Id.* at 45. Miller then told him to empty the contents of his pockets, which included his wallet. Miller

asked to see the wallet and found in it a large amount of genuine currency and a number of counterfeit $20 bills, which were separated from the real money. Also recovered from Kuhn's pockets was $180 in genuine currency, arranged in small, folded bundles. Kuhn was placed under arrest and transported to the police station. On route to the station, Holub spotted Armstrong on the street and identified him as the man who purchased the hamburger from her. Armstrong was arrested and handcuffed.

The defendants were questioned at the police station after having been read their rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Officer Mike Williams of the Wall Police Department conducted an inventory search of Kuhn's motorcycle and found a sawed-off shotgun as well as a cardboard box containing two counterfeit $20 bills and two bundles of genuine currency in a saddlebag attached to the motorcycle.

## II.

■ Armstrong and Kuhn urge reversal of their convictions on the ground that the evidence was insufficient to show that they knew the $20 bills were counterfeit and that they passed them with intent to defraud. They also argue that the government failed to sustain its burden of proving the existence of a conspiracy.

■ We note preliminarily that in the Eighth Circuit a motion for judgment of acquittal should be denied when, after reviewing the evidence in the light most favorable to the government, there is substantial evidence justifying an inference of guilt irrespective of any countervailing testimony that may be introduced. *United States v. Rodriguez,* 812 F.2d 414, 416 (8th Cir.1987). The essential elements of the charged offense may be proven by circumstantial evidence, and the evidence need not exclude every reasonable hypothesis except guilt. *United States v. Nabors,* 762 F.2d 642, 653 (8th Cir.1985).

■ Under 18 U.S.C. § 472, the government has the burden of showing not only that an accused passed or possessed counterfeit money, but that he did so with intent to defraud. *United States v. Pitts,* 508 F.2d 1237, 1240 (8th Cir.1974), *cert. denied,* 421 U.S. 967, 95 S.Ct. 1958, 44 L.Ed.2d 455 (1975). The requisite *mens rea* cannot be proved by a showing of possession or passing alone. *United States v. Haggins,* 545 F.2d 1009, 1013 (5th Cir.1977). The essential elements of the charged offense are seldom provable by direct evidence. *United States v. Castens,* 462 F.2d 391, 393 (8th Cir.1972). Because " '[k]nowledge in the mind of another is a subjective thing ... not always capable of proof by positive or direct evidence,' " circumstantial evidence may be relied upon in determining whether the requisite mental condition existed. *Id.* (quoting *United States v. Sheiner,* 410 F.2d 337, 340 (2d Cir.), *cert. denied,* 396 U.S. 825, 90 S.Ct. 68, 24 L.Ed.2d 76 (1969)). Among those acts from which guilty knowledge may be inferred are a rapid series of passings, *Ruiz v. United States,* 374 F.2d 619 (5th Cir.1967); the passing of counterfeit money at different establishments, *United States v. Berry,* 599 F.2d 267 (8th Cir.), *cert. denied,* 444 U.S. 862, 100 S.Ct. 129, 62 L.Ed.2d 84 (1979), even though the accused is not positively identified at other places in the vicinity, *Carrullo v. United States,* 184 F.2d 743 (8th Cir.1950); the use of large counterfeit bills for small purchases rather than change received in prior purchases, *id.;* and the segregation of counterfeit bills from genuine bills, *United States v. Perez,* 698 F.2d 1168 (11th Cir.1983).

The record more than adequately supports the finding that the jury could reasonably conclude that Armstrong and Kuhn had the requisite knowledge of the bills' counterfeit character and that they passed them with intent to defraud.

First, the texture, shape, and general appearance of the $20 bills that Armstrong and Kuhn passed were sufficiently odd to prompt two of the government witnesses to question immediately their legitimacy. Nancy Holub, the Dairy Queen clerk who waited on the defendants and had received training in the identification of counterfeit currency, said that she "immediately knew something was funny" about the $20 bill Kuhn presented to

pay for his hot dog. Tr. at 5.[1] When Armstrong produced a $20 bill with the same awkward feel, she became even more suspicious and promptly summoned the police, who told her to bring the bills to the bank for verification. The bills were of sufficiently poor quality to alert even an untrained eye to their bogus nature. Selina McGriff, the hardware store clerk who waited on the defendants at Gamble's Hardware store after the pair left the Dairy Queen, lacked any formal training in counterfeit money but questioned the authenticity of the $20 bill Armstrong tendered nonetheless.[2]

Second, the defendants' spending pattern during their short visit in Wall, *e.g.*, their purchase of small amounts using a $20 bill for each purchase, was consistent with methods used to turn counterfeit money into genuine currency. *See Carrullo*, 184 F.2d at 745; *Berry*, 599 F.2d at 268. Within a relatively short time period, Armstrong and Kuhn each tendered a $20 bill for one slice of pizza at Madre's Pizza,[3] and each produced a counterfeit $20 bill at the Dairy Queen for a hot dog and hamburger that cost $1.27 and $1.59, respectively. Armstrong presented yet another $20 bill for $1.37 worth of goods at Gambles Hardware store shortly after the pair left the Dairy Queen. The defendants offered no credible explanation for why they used a large denomination for each successive purchase of a small amount when it was clear that they could have paid for most, if not all, of their purchases with smaller change.

Third, counterfeit $20 bills with serial numbers identical to those recovered from Kuhn were discovered at all of the businesses, *e.g.*, the Wildlife Museum, the Buffalo Shop, and Madre's Pizza, that Armstrong and Kuhn visited. Although not direct evidence of guilty knowledge, the existence of notes with serial numbers identical to those recovered from the defendants at all of the establishments they visited is evidence the jury could have reasonably relied upon in concluding that Armstrong and Kuhn had the requisite knowledge and intent to defraud. As we noted in *Carrullo*, "it [is] clearly competent for the government to negative innocent intent by proof of repetitions of instances, *including anonymous instances*, or the occurrence of similar things in similar places. It is the repetition of the instances that tends to negative innocence of intent and the probability of coincidence." 184 F.2d at 746 (emphasis added).

Fourth, during his inventory search of Kuhn's motorcycle, Officer Williams found two counterfeit $20 bills inside a box in a saddlebag attached to the motorcycle. Underneath the two $20 notes was a bundle of genuine currency of various denominations that had a wrapper around it. Underneath that bundle was yet another bundle, this one consisting of genuine currency that was unwrapped. Chief Miller found a large amount of genuine currency that had been separated in similar fashion from counterfeit $20 bills in Kuhn's wallet at the time of his arrest. This segregation of counterfeit bills from genuine bills—for which neither defendant had a credible explanation—was evidence the jury could have reasonably relied upon in deciding whether the defendants had knowledge of the spurious nature of the bills. *See Perez*, 698 F.2d at 1170.

▪ Relevant to the issue of whether the evidence was sufficient to show that Armstrong and Kuhn had the requisite knowl-

---

1. The bill, according to Holub, was "very, very light, and . . . was not cut straight. . . ." Tr. at 7. The color and scroll work were also of poor quality. Supp.Hrg Tr. at 6.

2. We note that the evidence did not clearly establish whether the $20 bill Armstrong handed McGriff and then took back in exchange for correct change was in fact counterfeit. Armstrong argued the bill was real as he was arrested with $27.05 in genuine currency, twenty dollars of which were in the form of a $20 note; therefore, the evidence "warrants . . . the reasonable inference that the bill tendered at Gambles store was the same $20.00 bill that he had in his possession at the time of his arrest." Armstrong's Br. at 19. The government, understandably so, did not concede that the $20 bill Armstrong handed McGriff was real. It, however, offered only the testimony of McGriff who thought that the $20 bill Armstrong presented felt "odd." Tr. at 124.

3. Two counterfeit $20 notes with serial numbers identical to those recovered from Kuhn were recovered from the register at Madre's the day of the defendants' arrest.

edge and intent is the issue, also argued on appeal, of whether the evidence was sufficient to establish the existence of conspiracy. " 'The offense of conspiracy consists of an agreement between two or more persons to commit an offense, attended by an act of one or more of the conspirators to effect the object of the conspiracy.' " *United States v. Holder,* 560 F.2d 953, 957 (8th Cir.1977) (quoting *United States v. Hutchinson,* 488 F.2d 484, 490 (8th Cir.1973), *cert. denied,* 417 U.S. 915, 94 S.Ct. 2616, 41 L.Ed.2d 219 (1974)). The agreement need not be express or formal and may be established by circumstantial evidence. *Id.*

We believe that the evidence was sufficient to show the existence of a conspiracy. Armstrong and Kuhn were together both when they passed the $20 counterfeit bills at the Dairy Queen and when they visited the various businesses in Wall from which counterfeit $20 bills were later recovered. Additionally, their cross-country trip, during which they spent numerous hours together on the road and off, supports the inference that they "knew of the conspiracy and with that knowledge, voluntarily joined it." *United States v. Rice,* 652 F.2d 521, 527 (5th Cir.1981).

We are satisfied that under the totality of the circumstances a rational factfinder could have concluded beyond a reasonable doubt that Armstrong and Kuhn were aware of the spurious nature of the bills and passed them with the requisite intent to defraud. We are also satisfied that the evidence was sufficient to prove the existence of a conspiracy. Accordingly, we find that the district court's denial of the defendants' motions for judgment of acquittal was not error.

### III.

■ Kuhn additionally challenges his conviction on the ground that the district court erred in denying his motions to suppress the counterfeit bills found in his wallet as well as the bills and shotgun found in his motorcycle saddlebag.

The district court held that the search of Kuhn's wallet was valid as a search incident to arrest. We agree with the court that the present case is distinguishable from *Smith v. Ohio,* 494 U.S. 541, 110 S.Ct. 1288, 108 L.Ed.2d 464 (1990). In *Smith,* the Court held that a warrantless search of a suspect's bag could not be justified as a search incident to a lawful arrest where the fruits of the search, *e.g.,* drug paraphernalia found inside the bag, provided the probable cause for the ensuing arrest. *Id.* at 542, 110 S.Ct. at 1289. In so holding, the Court relied upon its earlier pronouncement that "an incident search may not precede an arrest and serve as part of its justification." *Id.* at 543, 110 S.Ct. at 1290 (quoting *Sibron v. New York,* 392 U.S. 40, 63, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917 (1968)). Unlike *Smith,* the fruits of the search in this case did not provide the probable cause to arrest. Chief Miller had probable cause to arrest Kuhn before he stopped him and searched his wallet. *See United States v. Brown,* 913 F.2d 570, 572 (8th Cir.) (distinguishing *Smith* on grounds that officers had articulable reasonable suspicion of criminal activity to justify search and seizure of defendants' car), *cert. denied,* 498 U.S. 1016, 111 S.Ct. 590, 112 L.Ed.2d 594 (1990). Nancy Holub, the Dairy Queen clerk who waited on Kuhn, positively identified Kuhn as one of the men who gave her a counterfeit $20 bill when she first spotted him on the street and again a few minutes later at the scene of his arrest. Indeed, Kuhn recognized Holub as the clerk who waited on him. Because Miller had probable cause to arrest Kuhn prior to searching his wallet, we find that his search of Kuhn's wallet was proper as incident to a valid arrest.

■ With respect to the money and shotgun found in Kuhn's saddlebag, the district court held that both items were properly admitted as products of a consensual search.[4] We review the conclusions of the district court under the clearly erroneous standard. *United States v. Archer,* 840 F.2d 567, 573 (8th Cir.), *cert. denied,* 488 U.S. 941, 109 S.Ct. 365, 102 L.Ed.2d 354 (1988). Thus, we

---

**4.** Because we find that Kuhn voluntarily consented to the search of his saddlebag, we do not, and indeed need not, discuss the issue addressed by the district court of whether the search was justified under the automobile exception.

will "ordinarily affirm the trial court's decision unless it is not supported by substantial evidence, it evolves from an erroneous conception of the applicable law, or we are left with a firm conviction that a mistake has been made after having considered the entire record." *United States v. Wallraff,* 705 F.2d 980, 987 (8th Cir.1983).

Police officers may search an area even absent a warrant or probable cause if the officers obtain voluntary consent from someone possessing authority over the area to be searched. *United States v. Chaidez,* 906 F.2d 377, 380 (8th Cir.1990); *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 2044, 36 L.Ed.2d 854 (1973). An individual's consent is voluntary if it is "the product of an essentially free and unconstrained choice by its maker." *Bustamonte,* 412 U.S. at 225, 93 S.Ct. at 2046. Whether consent is voluntary is a question of fact to be determined from the totality of the circumstances. *Id.* at 227, 93 S.Ct. at 2047. Among the characteristics of persons giving consent deemed relevant when assessing the voluntariness of their consent are their age, *id.* at 226, 93 S.Ct. at 2047; general intelligence and education, *United States v. Watson,* 423 U.S. 411, 425, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976); whether they were intoxicated or under the influence of drugs when consenting, *United States v. Rambo,* 789 F.2d 1289, 1297 (8th Cir.1986); and whether they consented after being informed of their right to withhold consent or of their *Miranda* rights, *Watson,* 423 U.S. at 425, 96 S.Ct. at 828.

On the facts of this case, we cannot say that the district court's finding that Kuhn voluntarily consented to the search of his saddlebag is clearly erroneous. Upon being told by Officer Williams that his motorcycle would be inventoried, Kuhn told Williams how to access the saddlebag using two latches on the side of the bag.[5] When Williams informed him that one of the latches was locked, Kuhn offered to open the saddlebag himself. *See Chaidez,* 906 F.2d at 382 (defendant's opening of trunk for officer is type of cooperation that evinces voluntariness).

Williams, however, declined his offer of help and told Kuhn to stay put. Fearful apparently that his saddlebag would be damaged, Kuhn told Williams to use one of the keys in the ignition to open the bag. Williams asked him if the key he had was the proper one with which to open the bag, and Kuhn replied that it was. Kuhn further told Williams that there was a shotgun in the right saddlebag and possibly a box with some bills in it, however "nothing ... [that he did not want the officers] to see." Supp.Hrg Tr. at 57, 84. Although Kuhn was not free to leave, there is no suggestion that coercion, tricks, or threats were used to induce him to consent to the search of the saddlebag. The search occurred after Kuhn had been read his *Miranda* rights. Finally, although Kuhn was apparently not informed of his right to refuse to consent, apprising a suspect of his right to refuse, while an important factor in determining voluntariness, is not required to render the consent voluntary. *Bustamonte,* 412 U.S. at 231, 93 S.Ct. at 2049. Relying on the deferential "clearly erroneous" standard, we find that the district court did not err in finding Kuhn's consent voluntary.

For the foregoing reasons, we affirm the judgments of the district court as to both defendants. We affirm as well the district court's denial of Kuhn's motion for a new trial, which, after careful review, we have determined not to merit discussion.

---

5. The saddlebag was constructed of a hard, fiber-glass-type substance.