# United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

————————————

No. 98-3204

————————————

United States of America,

        Appellee,

v.

Ramon Guel, Jr.,

        Appellant.

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

Appeal from the United States
District Court for the
Northern District of Iowa.

————————————

Submitted: March 12, 1999
Filed: July 7, 1999

————————————

Before RICHARD S. ARNOLD and HANSEN, Circuit Judges, and PERRY,[1] District
Judge.

————————————

HANSEN, Circuit Judge.

A jury convicted Ramon Guel, Jr., on charges of acting as an accessory after the
fact to the offense of possession with intent to distribute amphetamine, and with

———————————

[1]The Honorable Catherine D. Perry, United States District Judge for the Eastern
District of Missouri, sitting by designation.

conspiracy to distribute methamphetamine and amphetamine. The district court[2] sentenced Guel to a total term of 189 months in prison. On appeal, Guel challenges the sufficiency of the evidence used to convict him and certain sentencing decisions. We affirm.

## I. Facts

Ramon Guel, Jr., distributed drugs in Waterloo, Iowa. In January 1995, Guel and Jose Hernandez, another Waterloo drug source, were stopped by the California Highway Patrol while traveling in California. The officers searched the vehicle and discovered 19 packages of methamphetamine hidden in a spare tire. Lab testing later showed that the packages contained 15 pounds of 85 percent pure methamphetamine. The officers also discovered approximately $9,600 in cash—roughly $6,600 was found in Guel's boots, and another $3,000 was found in a pair of his jeans stowed in a bag. Guel was arrested but he returned to Waterloo after being released in August 1995.

In early 1996, law enforcement officials in the Waterloo area began investigating a suspected drug dealer named Julie Sue Mask. On April 1, 1996, police officers attempted to conduct a traffic stop of Mask. The stop, however, was unsuccessful and Mask eluded apprehension. As she was fleeing from the police, Mask discarded a black bag containing drugs she believed to be methamphetamine. The police recovered such a bag shortly thereafter.

After evading capture, Mask eventually secured a room at a local Econolodge hotel. Within a few days, Guel located Mask. Using the name "Daniel Bettencourt," Guel checked her into another room at the same hotel. According to Mask, Guel was planning to obtain and sell a pound of methamphetamine so that he and Mask could flee

---

[2]The Honorable Mark W. Bennett, United States District Judge for the Northern District of Iowa.

the area. Mask indicated that she wanted to surrender to the police, but Guel told her not to, and he directed Mask and her son, Korey Christian, to collect outstanding drug debts from Mask's customers. Christian testified that he thereafter assisted Guel in collecting money from Mask's customers.

The police eventually discovered Mask's hideout and conducted surveillance of the Econolodge. During this time, they observed a man leave room 207. After the police had entered room 207, they observed the same man trying to look inside the room. When the police confronted this man, he identified himself as Daniel Bettencourt. At trial, a police officer testified that the man the officers observed was Guel, and Mask testified that Guel left the room shortly before the police arrived.

During a search of room 207, the police found drugs, more than $1,000 in cash, and a green coat. The coat contained a set of brass knuckles and an additional $8,000 in cash. The police also found Guel's car keys inside the coat, as well as a key to another motel room registered to a person named Daniel Bettencourt, a business card from Logan Avenue Truck Sales, and a handwritten note from Mask to Guel. It was later discovered that a person claiming to be Daniel Bettencourt had recently purchased a truck from Logan Avenue Truck Sales. Mask and Christian testified that the coat belonged to Guel. Christian further testified that Guel wore the green coat while they were attempting to collect outstanding drug debts.

During Guel's trial, at least two persons testified that Guel supplied them with controlled substances for resale. Mask testified that Guel supplied her with various quantities of methamphetamine, including three separate one-pound deliveries. Mask sold the first pound, returned one pound because of its poor quality, and sold a portion of the last pound prior to her arrest. Mask testified that she received the third one-pound delivery in late March 1996, and that she possessed a portion of this delivery when the police attempted to stop her on April 1, 1996. According to Mask, Guel set resale prices and received the proceeds from her sales. In exchange, Guel gave Mask

3

drugs for her personal use. Another witness, Richard Fairbanks, testified that Guel supplied him with both methamphetamine and cocaine, and that Guel provided him with a digital scale for making accurate weight measurements.

Finally, Mask testified that while Guel was in jail in California, he asked her to help him explain the large amount of cash found in his boots and jeans. According to Mask, Guel wanted her to tell the police that she had paid him $3,000 for a car. Mask claimed, however, that she had agreed to pay Guel only $1,500 for a car, and of that amount, she had paid him only "[a] couple hundred bucks" prior to the California trip. (Trial Tr. at 248.)

On October 18, 1996, a two-count superseding indictment was filed in the United States District Court for the Northern District of Iowa. Count 1 charged Guel with being an accessory after the fact to the offense, committed by Julie Sue Mask, of possession with intent to distribute methamphetamine on or about April 1, 1996. Count 2 charged that between June 1994 and April 1996, Guel conspired to distribute more than one kilogram of a mixture or substance containing a detectable amount of methamphetamine. A jury convicted Guel on both counts. The district court denied Guel's motions for judgment of acquittal and a new trial. The court sentenced Guel to 189 months in prison, five years of supervised release, and imposed $100 in special assessments. Guel appeals his conviction and aspects of his sentence.

## II.  Sufficiency of the Evidence

Guel asserts that insufficient evidence supports the jury's verdict on both charges. We review the evidence in the light most favorable to the verdict. See United States v. Surratt, 172 F.3d 559, 563 (8th Cir. 1999). We resolve "evidentiary conflicts in favor of the government," and we accept "all reasonable inferences drawn from the evidence that support the jury's verdict." Id. (quotations omitted). On this strict standard of review, we uphold the verdict so long as "a reasonable minded jury could

have found the defendant guilty beyond a reasonable doubt."  Id. at 563-64 (quotations omitted).

## A.  Accessory After the Fact

In order to convict Guel on Count 1, the accessory after the fact charge, the jury had to find each of the following elements:

> *One*, Julie Sue Mask had committed the offense of possession with intent to distribute amphetamine[;]
> *Two*, defendant Ramon Guel, Jr., knew that Julie Sue Mask had committed the offense of possession with intent to distribute amphetamine; and
> *Three*, after the crime of possession with intent to distribute amphetamine had been committed by Julie Sue Mask, defendant Ramon Guel, Jr., helped her, in order to prevent her arrest, trial, or punishment.

(Final Jury Instr. No. 6.)  See also 18 U.S.C. § 3 (1994).  Guel does not dispute elements one and three.  He contends only that there was insufficient evidence showing that he knew Mask had committed the offense of possession with intent to distribute amphetamine.  See United States v. Bissonette, 586 F.2d 73, 76 (8th Cir. 1978) (noting that 18 U.S.C. § 3 requires "knowledge that a federal offense has been committed" and that the "jury can infer from the evidence presented that the accused had the requisite knowledge").  We disagree with Guel's contention.

Guel's argument rests on the faulty assumption that because he had no contact with Mask on April 1, 1996—the day Mask fled from police—the government did not prove that he knew Mask had committed the offense of possession with intent to distribute amphetamine.  Even assuming that Guel was unaware of Mask's specific actions on April 1, 1996, the government offered a great deal of circumstantial evidence that would allow a reasonable jury to conclude that Guel knew Mask had committed

5

the offense of possession with intent to distribute amphetamine. <u>Cf.</u> <u>United States v. Armstrong</u>, 16 F.3d 289, 292 (8th Cir. 1994) (noting that circumstantial evidence may be relied upon to prove knowledge). For example, Mask testified that she received a pound of methamphetamine from Guel in late March 1996, and that Guel knew she was going to sell the methamphetamine. She also testified that Guel supplied the drugs that she discarded as she fled from the police on April 1, 1996. Furthermore, Mask testified that while she was hiding from the police, she and Guel discussed selling more drugs and collecting outstanding drug debts in an effort to secure enough funds to flee the area. Finally, when she told Guel that she was considering surrendering to law enforcement authorities, he dissuaded her.

Based on the foregoing evidence, we hold that a reasonable jury could have found beyond a reasonable doubt that Guel knew Mask had committed the predicate offense of possession with intent to distribute amphetamine. Guel does not challenge the sufficiency of the evidence or any other issue with respect to the remaining elements of the crime. Thus, we affirm the district court's judgment as to Count 1.

B.    <u>Conspiracy to Distribute</u>

Guel next asserts that insufficient evidence supports the jury's verdict on Count 2, the conspiracy charge. To prove that Guel participated in "a conspiracy to manufacture or to distribute illegal drugs, the government must demonstrate (1) that there was a conspiracy, i.e., an agreement to manufacture or to distribute, (2) that the defendant knew of the conspiracy, and (3) that the defendant intentionally joined the conspiracy." <u>United States v. Hester</u>, 140 F.3d 753, 760 (8th Cir. 1998) (citing <u>United States v. Jones</u>, 101 F.3d 1263, 1267 (8th Cir. 1996), <u>cert. denied</u>, 520 U.S. 1160 (1997), and <u>cert. denied</u>, 520 U.S. 1202 (1997)). <u>Accord</u> <u>United States v. Rogers</u>, 91 F.3d 53, 57 (8th Cir. 1996). "Once a conspiracy is established, even slight evidence connecting a defendant to the conspiracy may be sufficient to prove the defendant's intentional involvement." <u>Hester</u>, 140 F.3d at 761 (quotations omitted).

6

The evidence against Guel was more than sufficient for a jury to find him guilty beyond a reasonable doubt. At least two of Guel's coconspirators, Julie Mask and Richard Fairbanks, testified that Guel supplied them with methamphetamine for resale.[3] Mask further testified that Guel had provided her with one-pound deliveries of methamphetamine on at least two occasions, and another pound of purported methamphetamine on a different occasion. Mask's son, Korey Christian, testified that he assisted Guel in collecting money from Mask's customers. Furthermore, Richard Fairbanks testified that Guel supplied him with methamphetamine for resale. Finally, as the government correctly points out, the evidence associated with the California traffic stop that uncovered 15 pounds of methamphetamine and large sums of cash corroborates the testimony linking Guel with a conspiracy to distribute drugs. We hold that sufficient evidence supports the jury's verdict with respect to Count 2.

## III. Sentencing Issues

A.      <u>Role in the Offense</u>

---

[3]Guel attacks the form of the government's evidence. He refers to the government's case as being "based largely on circumstantial evidence" and "includ[ing] a large dose of co-conspirator hearsay." (Appellant's Br. at 15.) Of course, the government can prove its entire case using circumstantial evidence. <u>See</u> <u>Armstrong</u>, 16 F.3d at 292 (noting that the government may prove the elements of the charged offense "by circumstantial evidence, and the evidence need not exclude every reasonable hypothesis except guilt"). Furthermore, under the Federal Rules of Evidence, a defendant's own admissions and qualifying coconspirator statements are not considered hearsay at all. <u>See</u> Fed. R. Evid. 801(d)(2); <u>see</u> <u>also</u> <u>United States v. Madrigal</u>, 152 F.3d 777, 781 (8th Cir. 1998) (noting that "[s]tatements of a coconspirator identifying a fellow coconspirator as his source of controlled substances [are] in furtherance of the conspiracy and therefore admissible") (quotations omitted). Moreover, Guel does not argue that any of the coconspirator testimony was inadmissible.

The probation office recommended that Guel receive a four-level increase to his base offense level for being an organizer or leader of a criminal activity involving five or more participants. See U.S. Sentencing Guidelines Manual § 3B1.1(a) (1997). After considering the evidence, however, the district court found that Guel was more appropriately characterized as a manager or supervisor, and that the criminal activity did not involve five or more individuals. Consequently, the district court applied only a two-level increase pursuant to USSG § 3B1.1(c). Guel argues that even this two-level enhancement is unwarranted. We review the district court's factual determinations regarding Guel's role in the offense for clear error. See United States v. Ayers, 138 F.3d 360, 364 (8th Cir.), cert. denied, 119 S. Ct. 219 (1998).

We find ample evidence supporting the district court's conclusion that Guel was a manager or supervisor in the offense. For example, both Mask and Fairbanks testified that Guel provided them with controlled substances for resale. Mask further testified that Guel set the price for the drugs, and that Guel received the proceeds from Mask's drug sales. Fairbanks testified that Guel supplied him with methamphetamine and a digital scale. Finally, Christian testified that he assisted Guel in collecting money from Mask's customers. Such evidence strongly supports the district court's finding that Guel was a manager or supervisor. We hold, therefore, that the district court did not clearly err in determining Guel's role in the offense.

B. Possession of Brass Knuckles

Finally, Guel contends that the district court erred in applying a two-level increase for possession of a dangerous weapon, namely the brass knuckles. See USSG § 2D1.1(b)(1). We review for clear error the district court's finding that Guel possessed a dangerous weapon in connection with a drug trafficking offense. See United States v. Rogers, 150 F.3d 851, 857 (8th Cir. 1998), cert. denied, 119 S. Ct. 888 (1999).

As an initial matter, we hold that brass knuckles are dangerous weapons. See USSG § 1B1.1, comment. (n.1(d)) (defining dangerous weapon to mean "an instrument capable of inflicting death or serious bodily injury"); see also State v. Tusing, 344 N.W.2d 253, 254 (Iowa 1984) (stating that the only use of brass knuckles "is to inflict injury"); United States v. Boman, No. 95-2066, 1996 WL 19254, at *3 (7th Cir. Jan. 18, 1996) (unpublished) (noting that "[a]pproximately 30 states explicitly define brass knuckles and bludgeons as deadly or dangerous weapons per se"). Thus, we focus our inquiry on whether the district court clearly erred in finding that Guel possessed the brass knuckles in connection with drug trafficking activities.

The police arrested Mask in room 207 at the Econolodge. The police found the brass knuckles in the pocket of a green coat in room 207. The police had previously observed Guel leaving room 207, and Mask and Christian testified that Guel owned the green coat in question. Other items found in the green coat strongly suggest that the coat belonged to Guel. For example, Guel used the alias "Daniel Bettencourt." The police found a key in the coat for a motel room registered to a Daniel Bettencourt. The police also found a business card for Logan Avenue Truck Sales in the coat. The government produced evidence that a person using the name Daniel Bettencourt had recently purchased a truck from Logan Avenue Truck Sales. Finally, the police found a note from Mask to Guel inside the coat. Thus, the foregoing evidence reasonably supports a conclusion that Guel possessed the coat, and therefore, the brass knuckles. See Surratt, 172 F.3d at 564 (holding that evidence of constructive possession is sufficient to prove possession of contraband).

Finally, we have little doubt that Guel possessed the brass knuckles in connection with his drug trafficking activities. At the time in question, Guel was attempting to obtain additional drugs and to collect outstanding drug debts. Hence, we hold that the district court did not clearly err in concluding that the green coat belonged to Guel, and that Guel possessed the brass knuckles in connection with a drug trafficking offense.

## IV. Conclusion

The district court's judgment is affirmed.

A true copy.

    Attest:

        CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT