*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

FREDERICK JOHN DUMMER V,

Defendant-Appellant.

FOR PUBLICATION
March 18, 2025
3:17 PM

No. 369752
Kent Circuit Court
LC No. 21-002191-FH

Before: BOONSTRA, P.J., and MURRAY and CAMERON, JJ.

MURRAY, J.

Defendant appeals by leave granted[1] the trial court's opinion and order denying his motion to dismiss the charge of possession of metallic knuckles, MCL 750.224(1)(d). The motion to dismiss was premised upon the argument that the criminalization of the mere possession of metallic knuckles violates the Second Amendment to the United States Constitution, as well as that amendment's counterpart in our state constitution, Const 1963, art 1, § 6. As far as we can discern, no appellate court across the nation has decided this issue under either the federal or a state constitution. For the following reasons, we hold that defendant's facial challenge to the statute fails, and affirm the trial court order.

## I. BACKGROUND

As noted, defendant was charged with (among other things) a violation of MCL 750.224(1)(d), for possessing metallic knuckles. Defendant moved the trial court to dismiss that charge, arguing that facially, and as applied to him, that statutory prohibition violates both the Second Amendment to the United States Constitution, US Const, Am II, and Article 1, § 6 of the Michigan Constitution, Const 1963, art 1, § 6, and their protection of an individual's right to keep and bear arms.

---

[1] *People v Dummer*, unpublished order of the Court of Appeals, entered July 17, 2024 (Docket No. 369752).

The trial court denied defendant's motion, concluding that his argument failed because: (1) defendant was not challenging the entirety of MCL 750.224, and therefore could not be successful in his facial challenge; (2) metallic knuckles had regularly been viewed as used by criminals or for improper purposes and were "dangerous and unusual"; and (3) metallic knuckles were not primarily a self-defense weapon. With these conclusions, the court held that defendant had not met his burden to establish the constitutional invalidity of the statute.

## II. STANDARD OF REVIEW AND CONSTITUTIONAL CHALLENGES

"Matters of constitutional and statutory interpretation are reviewed de novo." *People v Skinner*, 502 Mich 89, 99; 917 NW2d 292 (2018). The "authority to invalidate laws is limited and must be predicated on a clearly apparent demonstration of unconstitutionality." *People v Harris*, 495 Mich 120, 134; 845 NW2d 477 (2014). "Statutes are presumed to be constitutional, and we have a duty to construe a statute as constitutional unless its unconstitutionality is clearly apparent." *In re Sanders*, 495 Mich 394, 404; 852 NW2d 524 (2014). "A statute challenged on a constitutional basis is clothed in a presumption of constitutionality, and the burden of proving that a statute is unconstitutional rests with the party challenging it." *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 479 Mich 1, 11; 740 NW2d 444 (2007) (quotation marks and citation omitted).

"A challenge to the constitutionality of a statute is either a facial challenge or an as-applied challenge." *Promote the Vote v Secretary of State*, 333 Mich App 93, 117; 958 NW2d 861 (2020). On appeal, defendant only presses his facial challenge to MCL 750.224(1)(d).[2] "A facial challenge is a claim that the law is invalid *in toto*—and therefore incapable of any valid application, whereas an as-applied challenge considers the specific application of a facially valid law to individual facts." *Promote the Vote*, 333 Mich App at 117 (quotation marks and citation omitted). As this Court has summarized:

> A party challenging the facial constitutionality of a statute faces an extremely rigorous standard. A plaintiff must establish that no set of circumstances exists under which the act would be valid, and the fact that the act might operate unconstitutionally under some conceivable set of circumstances is insufficient to render the act invalid. Indeed, if any state of facts reasonably can be conceived that would sustain a legislative act, the existence of the state of facts at the time the law was enacted must be assumed. Because facial attacks, by their nature, are not dependent on the facts surrounding any particular decision, the specific facts surrounding plaintiffs' claim are inapposite. [*Id.* at 117-118 (quotation marks and citations omitted; alterations omitted).]

As to the difficulty in successfully pursuing a facial challenge to the constitutionality of a statute, the same holds true under federal law. See, e.g., *United States v Salerno*, 481 US 739, 745; 107 S

---

[2] Defendant asks that if his facial challenge fails we consider his as-applied argument. But his request is not an adequately developed one, so is not sufficiently preserved for appellate consideration. See *In re Rippy*, 330 Mich App 350, 362 n 5; 948 NW2d 131 (2019).

Ct 2095; 95 L Ed 2d 697 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.").

There is no requirement that a facial challenge to a statute be levied against the entirety of a statute, as opposed to a challenge limited to the specific offending statutory provision. In fact, the opposite is true, as the Legislature has indicated that:

> If any portion of an act or the application thereof to any person or circumstances shall be found to be invalid by a court, such invalidity shall not affect the remaining portions or applications of the act which can be given effect without the invalid portion or application, provided such remaining portions are not determined by the court to be inoperable, and to this end acts are declared to be severable. [MCL 8.5.]

"The law enforced after an invalid portion of an act is severed must be reasonable in light of the act as originally drafted." *People v FP Books & News, Inc (On Remand)*, 210 Mich App 205, 209; 533 NW2d 362 (1995). Here, as in *FP Books & News*, should defendant prevail on his challenge to the possession of the metallic knuckles portion of the statute, the remainder of MCL 750.224(1)(d) can be reasonably applied with metallic knuckles removed from its provisions. Defendant is entitled to maintain a facial challenge only to the possession of metallic knuckles portion of MCL 750.224.

## III. SECOND AMENDMENT JURISPRUDENCE

The purpose of the first ten amendments to the federal Constitution, known as the Bill of Rights, was to protect the rights enumerated in those amendments from interference by the federal government. See *McDonald v Chicago*, 561 US 742, 754; 130 S Ct 3020; 177 L Ed 2d 894 (2010) ("The Bill of Rights, including the Second Amendment, originally applied only to the Federal Government."); *Lessee of Livingston v Moore*, 32 US 469, 551-552; 8 L Ed 751 (1833) ("[I]t is now settled, that those amendments [in the Bill of Rights] do not extend to the states[.]"). The Founders were less concerned that States would interfere with their residents' rights, given the closer connection between a state government and its constituents. See *Nat'l Federation of Independent Business v Sebelius*, 567 US 519, 575-588; 132 S Ct 2566; 183 L Ed 2d 450 (2012) (opinion by ROBERTS, J.) ("Because the police power is controlled by 50 different States instead of one national sovereign, the facets of governing that touch on citizens' daily lives are normally administered by smaller governments closer to the governed. The Framers thus ensured that powers which 'in the ordinary course of affairs, concern the lives, liberties, and properties of the people' were held by governments more local and more accountable than a distant federal bureaucracy."), quoting The Federalist No. 45 (Madison) (Pacific Publishing Studio, 2009), pp 179-180. But in *McDonald*, 561 US at 750, some 219 years after adoption of the Second Amendment, the Court incorporated it through the Fourteenth Amendment to apply to the States.

The Second Amendment to the United States Constitution states that, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear

Arms, shall not be infringed." US Const, Am II.[3]  The Michigan Constitution's mandate is stated differently, with a more explicit focus on the individual right to bear arms for the defense of himself and the state, providing that "[e]very person has a right to keep and bear arms for the defense of himself and the state."  Const 1963, art 1, § 6.  According to the Court in *McDonald*, 561 US at 767, the Second Amendment resulted from the Founders' belief that "[s]elf-defense is a basic right, recognized by many legal systems from ancient times to the present day, and [as a result] in [*District of Columbia v*] *Heller* [, 554 US 570, 599; 128 S Ct 2783; 171 L Ed 2d 637 (2008)], we held that individual self-defense is the *central component* of the Second Amendment right." (quotation marks and citations omitted).

Because both "provisions grant individuals a right to keep and bear arms for self-defense," *People v Yanna*, 297 Mich App 137, 142; 824 NW2d 241 (2012), Second Amendment[4] challenges typically revolve around two questions: (1) is the conduct at issue covered by the amendment, and if so, (2) can the state regulate the conduct consistent with the amendment?[5]  To answer these questions, we turn to the two-part test articulated in *New York State Rifle & Pistol Ass'n, Inc v Bruen*, 597 US 1, 17, 24; 142 S Ct 2111; 213 L Ed 2d 387 (2022), which is employed when addressing challenges to government regulation of arms as violative of the Second Amendment. Under *Bruen*, courts must first determine whether the plain language of the Second Amendment protects the conduct which the government regulation prohibits.  Here, that conduct is possession of metallic knuckles.  If the amendment does protect the challenged conduct, it is then the government's burden to establish that the particular regulation of that protected conduct is nonetheless permissible pursuant to our national historical tradition of weapon regulation.  The *Bruen* Court summarized this analytical framework:

> [W]e hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  To justify its regulation, the government may not simply posit that the regulation promotes an important interest.  Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.  Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.  [*Id*. at 17 (quotation marks and citation omitted).]

See also *Wade v Univ of Mich (On Remand)*, 347 Mich App 596, 613-614; 16 NW3d 543 (2023). We now turn our attention to applying the *Bruen* test to defendant's facial challenge to the criminalization of the possession of metallic knuckles contained in MCL 750.224(1)(d).

---

[3] The United States Supreme Court has held that the amendment protects an individual's right to bear arms.  *Dist of Columbia v Heller*, 554 US 570, 595; 128 S Ct 2783; 171 L Ed 2d 637 (2008).

[4] *Heller* clarified that the right to bear arms was not so much granted by the Second Amendment, as the amendment preserved the existing right held by the public to bear arms.  *Heller*, 554 US at 592.

[5] For convenience we refer to the Second Amendment, but our rationale equally applies to our state constitutional provision.  See *Yanna*, 297 Mich App at 142.

## IV. APPLICATION OF *BRUEN*

First, we set out the pertinent provisions of the statute that defendant is challenging:

(1) *A person shall not* manufacture, sell, offer for sale, or *possess any of the following*:

(a) A machine gun or firearm that shoots or is designed to shoot automatically more than 1 shot without manual reloading, by a single function of the trigger.

(b) A muffler or silencer.

(c) A bomb or bombshell.

(d) A blackjack, slungshot, billy, *metallic knuckles*, sand club, sand bag, or bludgeon.

(e) A device, weapon, cartridge, container, or contrivance designed to render a person temporarily or permanently disabled by the ejection, release, or emission of a gas or other substance. [MCL 750.224(1) (emphasis added).]

Metallic knuckles, more commonly referred to as brass knuckles, are not defined by statute, but are generally known to be "a set of metal finger rings or guards attached to a transverse piece and worn over the front of the doubled fist for use as a weapon." Merriam-Webster's Collegiate Dictionary (11th ed). As was true with the predecessor statute, 3 Comp Laws 1929, § 16751(3),[6] MCL 750.224(1)(d) "contains no limitations of place, time, purpose, or use. It prohibits the possession of the enumerated weapons by any one, other than an excepted person, in private as well as in public, in the home or elsewhere, and whatever the purpose and contemplated use." *People v Brown*, 253 Mich 537, 539; 235 NW 245 (1931).

---

[6] 3 Comp Laws 1929, § 16751(3), contained essentially the same list of weapons as does the current statute, including metallic knuckles:

It shall be unlawful within this state to manufacture, sell, offer for sale or possess any machine gun or firearm which can be fired more than sixteen (16) times without reloading or any muffler, silencer, or device for deadening or muffling the sound of a discharged firearm, or any bomb, or bomb shell, blackjack, slung shot, billy, metallic knuckles, sand club, sand bag, or bludgeon or any gas ejecting device, weapon, cartridge, container, or contrivance designed or equipped for or capable of ejecting any gas which will either temporarily or permanently disable, incapacitate, injure or harm any person with whom it comes in contact.

## A. *BRUEN* STEP ONE - ARE METALLIC KNUCKLES AN ARM COVERED BY THE SECOND AMENDMENT?

True to his obligation under *Bruen* and *In re Request for Advisory Opinion*, defendant first argues that the plain language of the Second Amendment protects his ability to possess metallic knuckles. To resolve this issue, we must examine

> (1) "whether the challenger is 'part of "the people" whom the Second Amendment protects,' " (2) whether the item at issue is an "arm" that is " 'in common use' today for self-defense," and (3) "whether the 'proposed course of conduct' falls within the Second Amendment." [*Rocky Mountain Gun Owners v Polis*, 121 F4th 96, 114 (CA 10, 2024), quoting *United States v Alaniz*, 69 F4th 1124, 1128 (CA 9, 2023), in turn quoting *Bruen*, 597 US at 31-32.]

Although what exactly is required to be determined under *Bruen* step one is subject to considerable debate (which we address shortly), there is no dispute that it minimally requires a court to determine whether the challenger to the statute is a "person" covered by the amendment, and that the activity at issue—here possession of metallic knuckles—is covered by the amendment.

Neither party has addressed whether defendant is part of the "people" covered by the amendment, but there is little doubt but that he is. See *Heller*, 554 US at 580-581; *Wade*, 347 Mich App at 614. The parties do, however, address whether possession of metallic knuckles is protected by the plain text of the amendment, and they seem to agree that metallic knuckles are a weapon and, therefore, constitute an "arm" under the amendment. Their conclusion is correct, for according to *Heller* an "arm" is any weapon used for offense or self-defense:

> The 1773 edition of Samuel Johnson's dictionary defined "arms" as "[w]eapons of offence, or armour of defence." 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978) (hereinafter Johnson). Timothy Cunningham's important 1771 legal dictionary defined "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." 1 A New and Complete Law Dictionary; see also N. Webster, American Dictionary of the English Language (1828) (reprinted 1989) (hereinafter Webster) (similar). [*Heller*, 554 US at 581 (alteration in original)].

Additionally, the "definition of 'bear' naturally encompasses public carry," or, more simply put, possession. *Bruen*, 597 US at 32 (stating that *Heller* confirmed that the right to "bear arms" refers to the right to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person"). Because metallic knuckles can be used to either attack or thwart off an attacker, or stated differently, can be taken into an individual's hand to strike another, pursuant to *Heller*, the plain language of the Second Amendment applies to defendant's possession ("bearing") of metallic knuckles ("arms").

So far so good for defendant's position. But as *Heller*, *Bruen*, and subsequent courts have noted, protected "arms" include only those weapons commonly used and possessed by law-abiding citizens for lawful purposes. See *Rocky Mountain Gun Owners*, 121 F4th at 116-117, and *Yanna*,

279 Mich App at 143 (recognizing that the Second Amendment does not protect weapons not typically possessed by law-abiding citizens for lawful purposes).

But where do we address this "common use" consideration—during *Bruen*'s first or second step? Where courts consider the common use issue is more than a theoretical matter, as which party bears the burden of proof differs at each step: defendant has the initial burden under step one to establish that the challenged act is covered by the amendment, and if he does so, the prosecution has the burden to prove that regulation of metallic knuckles has historically occurred in a similar, though not identical, manner as it is in the challenged statute. See *Bruen*, 597 US at 17.

"There is no consensus on whether the common-use issue belongs under *Bruen* step one or *Bruen* step two." *Bevis v City of Naperville*, 85 F4th 1175, 1198 (CA 7, 2024); see also *Commonwealth v Canjura*, 494 Mass 508, 515 n 10; 240 NE3d 213 (2024), citing *Bevis*, 85 F4th at 1198; *Hanson v District of Columbia*, ___ US App DC ___;120 F4th 223, 232 n 3 (2024) (assuming, without deciding, that the "common use" test applied under the first step); *United States v Price*, 111 F4th 392, 415 (CA 4, 2024) (QUATTLEBAUM and RUSHING, JJ., concurring) ("[T]he majority analyzes common use at *Bruen*'s plain text step, while Judge Richardson in dissent and Judge Niemeyer in concurrence reason that common use falls under *Bruen*'s historical tradition step. Our sister circuits have also splintered on the issue.").

But in *Wade*, 347 Mich App at 614, we implicitly cabined the "common use" consideration under the first *Bruen* step, and we now explicitly conclude that whether the arm is commonly used today for lawful purposes is best considered under step one, as it is at that point that the challenger must prove that the arm at issue is facially covered by the Amendment. See, e.g., *Heller*, 554 US at 625 ("[T]he Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns."); *Price*, 111 F4th at 400-401 ("The Court in *Bruen* focused on the third of these inquiries, and for good reason—there was no dispute in that case that the petitioners, 'two ordinary, law-abiding, adult citizens,' were among the people protected by the Second Amendment, and neither party disputed that the weapons regulated by the challenged regulation—handguns—were in common use for self-defense. But by engaging in these inquiries at step one, *Bruen* made clear that the limitations on the scope of the Second Amendment right identified in *Heller* are inherent in the text of the amendment.") (citation omitted); *United States v Lane*, 689 F Supp 3d 232, 252 n 22 (ED Va, 2023); *United States v Berger*, 715 F Supp 3d 676, 681-686 (ED Pa, 2024) ("Following *Bruen*, most federal courts considering Second Amendment challenges address the common-use issue at step one of the analysis."); *State v Giannone*, 228 Conn App 11, 46-60; 323 A3d 360 (2024) ("Consequently, the common use analysis informs whether the conduct at issue is covered by the second amendment's plain text and asks whether an instrument, even if it is an 'arm,' is the type of arm that is protected by the second amendment—that is, as *Bruen* and *Heller* instruct, an arm that is commonly used or typically possessed for lawful purposes like self-defense—or is instead a dangerous and unusual weapon that falls outside of the second amendment's scope.").

But unlike some courts, we do not see the "common use" consideration as encompassing whether the arm is also, or conversely, a "dangerous and unusual" weapon that is not protected by the amendment. See *Canjura*, 494 Mass at 516 (recognizing that there is a split on whether the common-use and dangerous and unusual considerations are distinct). We agree with the observation in *Capen v Campbell*, 708 F Supp 3d 65, 79 (D Mass 2023), that the "common use"

inquiry takes place at step one, but whether an arm is one of those "dangerous and unusual" weapons subject to regulation falls under *Bruen* step two:

> One approach—which is perhaps the most in keeping with the language and reasoning of *Heller* and *Bruen*—is to ask first whether the firearm is the *general* type of weapon that is in common use by ordinary citizens for lawful purposes such as self-defense. If the answer is yes, the Second Amendment presumptively applies. However, certain *specific* types of such weapons may still be subject to regulation if they are "dangerous and unusual," consistent with text, history, and tradition. Put another way, the first step (that is, what is presumptively protected by the Second Amendment) addresses broad categories, and the second step (that is, what may be regulated) applies to specific types of weapons (or, in appropriate cases, specific persons who cannot possess weapons or specific places where weapons cannot be carried).

In our view this latter test is more focused on the historical treatment of a weapon, shown by how it was treated during the relevant time, and whether it is one of those weapons that has been part of the "historical tradition of prohibiting the carrying of dangerous and unusual weapons" subject to regulation. *Heller*, 554 US at 627 (quotation marks omitted). See also *United States v Rahimi*, 602 US 680, 691; 144 S Ct 1889; 219 L Ed 2d 351 (2024), and *Bianchi v Brown*, 111 F4th 438, 496 (CA 4, 2024) (RICHARDSON, J., joined by NIEMEYER, AGEE, QUATTELBAUM, and RUSHING, JJ., dissenting) ("The [*Miller*] Court then explained that, because of this limitation, the Second Amendment does not protect 'arms that are highly unusual in society at large'—such as 'M-16 rifles and the like'—even though such arms are 'most useful for militia service.' These weapons are therefore unprotected not because they aren't 'Arms' under the plain text, but because they fall within the historical tradition of regulating dangerous and unusual weapons.") (citation omitted). Thus, whether the arm was considered dangerous and unusual will be addressed, if at all, under *Bruen* step two.

As to whether metallic knuckles are in common use today for self-defense[7] or other lawful purposes, neither party has provided any evidence regarding the prevalence of metallic knuckles sold to the nationwide public, or otherwise. Typically, courts have relied on this type of statistical information when addressing this issue. See, e.g., *Hollis v Lynch*, 827 F3d 436, 449 (CA 5, 2019),

---

[7] The use of a weapon like metallic knuckles for self-defense is not the only permissible use of an arm, for *Heller* recognized that "[t]he prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense *and hunting*." *Heller*, 554 US at 599 (emphasis added); see also *Heller v District of Columbia*, 399 US App DC 314, 330; 670 F3d 1244 (2011) (interpreting *Heller*'s statement that individual self-defense is the Second Amendment's "central component" as recognizing that "the Second Amendment protects the right to keep and bear arms for other lawful purposes, such as hunting") (quotation marks omitted); *Giannone*, 228 Conn App at 38-39; *Bevis*, 85 F4th at 1192. We recognize, however, that unlike a switchblade or gun that can be used for self-defense, hunting, or other lawful uses, metallic knuckles are only used to cause more physical harm when striking another person.

abrogated on other grounds by 116 F4th 458 (CA 5, 2024) ("Every post-*Heller* case to grapple with whether a weapon is 'popular' enough to be considered 'in common use' has relied on statistical data of some form, creating a consensus that 'common use is an objective and largely statistical inquiry.' "), quoting *New York State Rifle & Pistol Ass'n v Cuomo*, 804 F3d 242, 256 (CA 2, 2015). Also relevant to whether a weapon is commonly accepted today as being used for a lawful purpose is the number of states that allow or disallow (or otherwise place some limit upon) their use. *Caetano v Massachusetts*, 577 US 411, 420; 136 S Ct 1027; 194 L Ed 2d 99 (2016) (ALITO, J., joined by THOMAS, J., concurring). See also *Berger*, 715 F Supp 3d at 691 (recognizing that some courts have looked to the number of state laws regulating the weapon).

On this last point defendant has submitted statistical information from a website regarding how many states currently preclude the possession of metallic knuckles, how many regulate but do not ban their possession, and how many states leave them unregulated. Accepting those representations as true (the prosecution has not disputed their accuracy), there are currently 21 other states with statutory prohibitions on possession of metallic knuckles identical (or very similar) to Michigan's, while another 17 have myriad regulations on the possession and use of metallic knuckles. The remaining 12 states do not regulate metallic knuckles. These numbers, again accepting their accuracy, show that just shy of a majority of states currently regulate the possession of these weapons, and a small minority have no regulation. While these numbers do not tell us much about how commonly they are *used* in today's America,[8] we will err on the side of caution, *Heller*, 554 US at 582, 595 (Second Amendment applies prima facie to all bearable weapons), and infer that because a small minority of states do not regulate the possession and use of metallic knuckles, they are commonly used for lawful purposes. See, e.g., *Canjura*, 494 Mass at 516 (where only 7 states ban switchblades, court inferred that they were commonly used today for self-defense).

For these reasons, we hold that defendant's conduct of bearing metallic knuckles was an activity covered by the plain text of the Second Amendment, and therefore is presumptively constitutionally protected conduct.

B. *BRUEN* STEP TWO-HISTORICAL USE AND REGULATION OF METALLIC KNUCKLES

We now turn to the second part of the *Bruen* test. In that regard, defendant argues that the prosecution failed to meet its burden to establish that there has been a historic tradition in the United States of regulating or prohibiting the possession of metallic knuckles. In addressing this historical question, we look to the extent the states prohibited possession of these weapons during the relevant time period.

Once it is established that the plain language of the Second Amendment covers an individual's otherwise prohibited conduct, as is the case here, the burden then shifts to the government to establish that such a prohibition is rooted in historical tradition to the extent that it

---

[8] See *Friedman v City of Highland Park, Ill*, 784 F3d 406, 409 (CA 7, 2015), and *Avitabile v Beach*, 368 F Supp 3d 404, 411 (ND NY, 2019) (both expressing uncertainty about relying on how common a weapon is today when the challenged statute prohibits their use).

is constitutionally permissible. *Bruen*, 597 US at 19-22. Certain regulation of weapons is constitutionally permissible, for "[l]ike most rights, the right secured by the Second Amendment is not unlimited," and nothing in *Bruen* "cast[s] doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 US at 626-627. The Court also recognized a historical tradition of "prohibiting the carrying of 'dangerous and unusual weapons.' " *Id*. at 627 (citations omitted).

How do we gauge the founding-era history, if any, of the states regulating metallic knuckles? "At the founding, the bearing of arms was subject to regulations ranging from rules about firearm storage to restrictions on gun use by drunken New Year's Eve revelers." *Rahimi*, 602 US at 691. "[T]he appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition," and a "court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances." *Id*. at 692 (quotation marks, citation, and alteration omitted). The Court explained how this analysis would proceed:

> For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding. And when a challenged regulation does not precisely match its historical precursors, it still may be analogous enough to pass constitutional muster. The law must comport with the principles underlying the Second Amendment, but it need not be a "dead ringer" or a "historical twin." [*Id*. (quotation marks and citations omitted).]

 Accord: *Bruen*, 597 US at 26-27.

Important to our review of historical analogues is the "how" and "why" of relevant historical regulations. See *Rahimi*, 602 US at 692 ("Why and how the regulation burdens the right are central to this [historical] inquiry."); *Hanson*, 120 F4th at 234; *Bevis*, 85 F4th at 1199 ("A regulation is a part of this tradition [of state regulation] if one can provide answers to two questions: (1) how, and (2) why, does a given regulation 'burden a law-abiding citizen's right to armed self-defense?' ") (citation omitted). And, in reviewing how metallic knuckles were treated during the relevant time, we are not looking for a historical mold, but guiding principles. *Rahimi*, 602 US at 740 (BARRETT, J., concurring).

When conducting a historical analysis, "there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining" the scope of the Second Amendment, or whether the Amendment's understanding is defined exclusively by the common understanding when it was ratified in 1791. *Bruen*, 597 US at 37-38. Thus, "*Bruen* cautions that 'not all history is created equal.' " *Worth v Jacobson*, 108 F4th 677, 692 (CA 8, 2024), quoting *United States v*

*Sitladeen*, 64 F4th 978, 985 (CA 8, 2023), in turn quoting *Bruen*, 597 US at 34. "Rather, '[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them.' " *Worth*, 108 F4th at 692, quoting *Bruen*, 597 US at 34, in turn quoting *Heller*, 554 US at 634-635. The starting point, no doubt, is 1791, when the Amendment was adopted. *Wade*, 347 Mich App at 613 (noting the unresolved historical time-period dispute under *Bruen*, but recognizing the Court emphasized the founding-era time period as most relevant to an original understanding).

" 'Strictly speaking,' [however, Michigan] 'is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second.' " *Worth*, 108 F4th at 692, quoting *Bruen*, 597 US at 37. Courts are, therefore, permitted to consider how an arm was treated in the Reconstruction era when the Fourteenth Amendment was adopted, *Heller*, 554 US at 605 ("We now address how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century."), so long as that later history is not inconsistent with that of the founding era, *Bruen*, 597 US at 66 ("As we suggested in *Heller*, however, late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence."). When, for example, the historical understanding about public-carrying a firearm was the same in both 1791 and 1868, then historical evidence from the time of ratification of the Fourteenth Amendment is more relevant. *Bruen*, 597 US at 38.

In support of its burden to establish a showing that a ban on possessing metallic knuckles is historically permissible, the prosecution cited the following: court precedent dating from 1871 until 1921 from four states; five state statutes prohibiting metallic knuckles with enactment dates ranging between 1872 and 2007, only one of which strictly prohibits the possession of metallic knuckles; and one law review article from 1983.[9] However, it has provided no evidence of how metallic knuckles were treated from 1791 until 1868.[10]

Digging a little deeper[11] into how metallic knuckles were historically treated, we can discern that from approximately 1845 and onward metallic knuckles were associated not with law-

---

[9] The prosecution's citation to *People v Williams*, 106 NYS3d 738 (2019), was misplaced, as that court analyzed the legality of banning trench knives—metallic knuckles with a knife attached to it—as strictly a type of knife; the court did not evaluate whether a ban on metallic knuckles was reconcilable with the Second Amendment.

[10] The *Bruen* majority noted that a court's review of these issues generally should be "based on the historical record compiled by the parties." *Bruen*, 597 US at 25 n 6. But relying solely on party presentation to resolve a dispute about constitutional history potentially opens the door to reaching a conclusion based on an incomplete or inaccurate picture of the relevant statistics. See *Worth v Harrington*, 666 F Supp 3d 902, 917 (D Minn, 2023).

[11] The number of decisions addressing weapons prohibitions under the Second Amendment is not as high as one might think, as the Amendment was only incorporated against the States through the Fourteenth Amendment in 2010. See *Bevis*, 85 F4th at 1189 ("The late date of the *McDonald* decision—2010—explains why there are so few cases exploring the Second Amendment implications of state laws regulating weapons from the time the Amendment became part of the

-11-

abiding citizens who sought to use the weapon for self-defense, but with criminals and aggressors, and were considered by the courts and legislatures of the mid-to-late nineteenth century as dangerous and unusual. And, these mid-to-late nineteenth century laws and decisions are a more specific articulation of colonial period laws that banned the public carrying of dangerous and unusual weapons.

"American history is replete with examples of laws regulating the possession of certain arms like Bowie knives, brass knuckles, or Arkansas toothpicks . . . ." McWilliam, *A Classical Legal Interpretation of the Second Amendment*, 28 Tex Rev of Law and Politics 125, 165 (2023). Many of the state regulations of brass knuckles and similar weapons existed because "[t]hese unusual weapons are not commonly used for self-defense . . . ." *Id.*

For example, addressing a West Virginia ordinance that prohibited the concealed carry of certain weapons, including revolvers and brass knuckles, a court distinguished between guns, rifles and muskets, which were frequently lawfully used by law-abiding citizens, and "pistols, bowie–knife, brass knuckles, billies, and such other weapons [which] are usually employed in brawls, street fights, duels, and affrays, and are only habitually carried by bullies, blackguards, and desperadoes, to the terror of the community and the injury of the state." *State v Workman*, 35 W Va 367; 14 SE 9, 11 (1891), overruled in part by *Bruen*, 597 US 1 (2022).[12] Likewise, several decades later our Supreme Court recognized that the Michigan Legislature, in enacting the predecessor to MCL 750.224(1)(d), made a distinction between weapons used by law-abiding citizens, and those used by the criminal element:

> The list of weapons in section 16751, supra, is significant and demonstrates a definite intention of the Legislature to protest [sic] society from a recognized menace. It does not include ordinary guns, swords, revolvers, or other weapons usually relied upon by good citizens for defense or pleasure. It is a partial inventory of the arsenal of the 'public enemy,' the 'gangster.' It describes some of the particular weapons with which he wars on the state and reddens his murderous trail.

---

Constitution (1791) to the present."). Most weapons regulation challenges in the nineteenth century came under state constitutions.

[12] We recognize that the *Workman* Second Amendment analysis is outdated, but we only cite the opinion for its late-nineteenth-century categorization of weapons such as metallic knuckles, and not for its legal reasoning. But see, *Fouts v Bonta*, 718 F Supp 3d 1276, 1287 (SD Cal, 2024) ("*Workman* was wrong in concluding the Second Amendment does not cover arms like the pistol and the billy. But, if that was its viewpoint in 1891, it explains why the state legislature may have (also incorrectly) thought it was not infringing on its citizens' Second Amendment rights by prohibiting the simple possession of a billy. Apparently, too many years had passed since the nation's founding. Along the way, the meaning of the Constitution had become muddled. The *Workman* case provides a reason to suspect that other state legislatures during the late 1800s may have likewise incorrectly regarded a billy as beyond the ambit of the Second Amendment. *Workman* is exactly the reason *Bruen* looks to Founding-era laws, not post-Civil War laws, to understand the Bill of Rights.").

The blackjack is properly included in the list of outlawed weapons. [*Brown*, 253 Mich at 542.]

And the Seventh Circuit in *Bevis* referenced similar statutory provisions dating back to the mid-to-late nineteenth century establishing regulations that were part of an American tradition of regulating dangerous and unusual weapons, including specifically, brass knuckles. *Bevis*, 85 F4th at 1199-1202. See also *Teter v Lopez*, 76 F4th 938, 949–950, 951 n 11 (CA 9, 2023) (recounting history of the heavy regulation in the mid-to-late nineteenth century of metallic knuckles and other similar dangerous weapons), reh gtd, opinion vacated, 93 F4th 1150 (CA 9, 2024), and vacated as moot, 125 F4th 1301 (CA 9, 2025); *Duncan v Bonta*, 695 F Supp 3d 1206, 1250 n 216 (SD Cal, 2023) ("As for other non-blade impact weapons, the sales and manufacture bans in a minority of states for slungshots and knuckles could be considered as involving arms 'not typically possessed by law-abiding citizens for lawful purposes.' ").

Indeed, as far as we can discern, states began regulating (including banning) metallic knuckles in the 1840s, and continued to do so on a more frequent basis into the late 1800s. These regulations entailed anything from total bans to limits on concealed carry,[13] but importantly for our purposes, these state statutes reveal that these mid-to-late nineteenth century policymakers treated metallic knuckles as weapons that were unusual and dangerous, not used for self-defense of any kind, and typically only found in the hands of thugs and murderers. See, e.g., *Bell v State*, 89 Ala 61, 61-62; 8 So 133 (1890) (in a case where the defendant was being prosecuted for carrying concealed brass knuckles in violation of an 1886 statute, the court noted that "[t]he carrying concealed of a *barbarous weapon of this class*, *which is usually the instrument of an assassin*, *and an index of a murderous heart*, is absolutely prohibited by section 3776 of the Criminal Code of this state. The law does not recognize it as a weapon of self-defense") (emphasis added); *English v State*, 35 Tex 473, 476 (1871), overruled in part by *Bruen*, 597 US 1 (2022) (in addressing an 1871 law that restricted the possession of, amongst other things, brass knuckles, the court noted that these weapons are "deadly devices and instruments" . . . "from which so many murders, assassinations, and deadly assaults have sprung"); *Nguyen v Bonta*, 720 F Supp 3d 921, 938-939 (SD Cal, 2024) (concluding that these "nineteenth century deadly weapons bans arose from 'the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,' " to which the Second Amendment does not apply) (citation omitted).

Though outside the relevant time period, in 1921 the North Carolina Supreme Court also recognized that weapons such as brass knuckles were not considered "arms" in the early twentieth century, as they were not commonly used by lawful citizens:

The maintenance of the right to bear arms is a most essential one to every free people and should not be whittled down by technical constructions. It should be construed to include all "arms" as were in common use, and borne by the people as such when this provision was adopted. It does not guarantee on the one hand that the people have the futile right to use submarines and cannon of 100 miles range

---

[13] Michigan had an 1887 law that prohibited the concealed carrying of metallic knuckles and " 'other offensive and dangerous weapon[s] or instrument[s].' " *People v Pendleton*, 79 Mich 317, 318-319; 44 NW 615 (1890), quoting 129 PA 1887.

nor airplanes dropping deadly bombs, nor the use of poisonous gases, nor on the other hand does it embrace dirks, daggers, slung-shots and brass knuckles, which may be weapons but are not strictly speaking "arms" borne by the people at large, and which are generally carried concealed. [*State v Kerner*, 181 NC 574; 107 SE 222, 224 (1921)].

We have not been pointed to, nor have we found, any statutes or caselaw that consider metallic knuckles as anything other than dangerous and unusual, and as a weapon not possessed by law abiding citizens for lawful purposes. Although this historical law is from the outer end of the relevant time period, it supports our conclusion that metallic knuckles were considered unusual and dangerous, and were deemed to be mainly used by those engaging in criminal acts. And as a result, these weapons were either extensively regulated, or banned.

Though there is no precise definition of what constitutes a dangerous and unusual weapon, at one end the Supreme Court has held that handguns are "the quintessential self-defense weapon" and are "indisputably" not dangerous and unusual, *Bruen*, 597 US at 47 (quotation marks and citation omitted), while at the other end it has identified "M-16 rifles and the like" as examples of dangerous and unusual weapons that "may be banned," *Heller*, 554 US at 627. And certainly, because hand guns are dangerous, that factor alone cannot suffice to make an arm subject to lawful regulation.[14]

Nevertheless, we conclude that these statutory regulations reflect what the courts noted above have uniformly concluded—that policymakers before and soon after the ratification of the Fourteenth Amendment considered metallic knuckles to be dangerous and unusual weapons that were not used by law-abiding citizens for lawful purposes, and therefore were subject to regulation. But as we detail below, the regulations entailed many different restrictions, with the majority being prohibitions of concealed carry.

The mid-to-late nineteenth century saw at least 14 states and the District of Columbia enacting bans on concealed carry of metallic knuckles. See Florida Act of Aug. 6, 1868, ch. 1637, § 14, 1868 Fla. Laws 61, 95; District of Columbia Act of Aug. 10, 1871, § 1; Maryland with initial bans done locally, in Annapolis in 1872 (Act of Feb. 26, 1872, ch. 42, § 1, 1872 Md Laws 56, 56-57) and statewide in 1886 (Act of Apr. 7, 1886, ch. 375, § 1, 1886 Md Laws 602, 602); Wisconsin in 1872 without reasonable cause (Act of Feb. 14, 1872, ch. 7, § 1, 1872 Wis. Sess. Laws 17, 17-18); Alabama in 1873 (Act of Apr. 8, 1873, No. 87, ch. 87, 1872-1873 Ala. Laws 130, 130-31

---

[14] There is little doubt that the only purpose of metallic knuckles is to cause injury or death. See, e.g., *State v Tusing*, 344 NW2d 253, 254 (Iowa, 1984) (concluding that it "is obvious that brass knuckles fulfill the first part of this test [that it is an instrument designed primarily for use in inflicting death or injury]; unlike a revolver or a knife, which could be used for target shooting or to peel an apple, there is only one purpose for brass knuckles, and that is to inflict injury, presumably upon a human being."); *People v Brown*, 406 Mich 215, 219-220; 277 NW2d 155 (1979) ("It is well settled that some instruments such as stilettos and brass knuckles are dangerous weapons Per se . . . ."); *United States v Guel*, 184 F3d 918, 923 (CA 8, 1999) (pointing out that near the turn of the twentieth century approximately 30 states defined brass knuckles as dangerous per se).

(1873); North Carolina in 1879 (Act of Mar. 5, 1879, ch. 127, 1879 N.C. Sess. Laws 231, 231); Mississippi without good reason in 1878, 1896, and 1898 (Act of Feb. 28, 1878, ch. 46, § 1, 1878 Miss Laws 175, 175; Act of Mar. 11, 1896, ch. 104, § 1, 1896 Miss. Laws 109, 109-110; Act of Feb. 11, 1898, ch. 68, § 1, 1898 Miss Laws 86, 86); Michigan in 1887 (Act of May 31, 1887, No. 129, § 1, 1887 Mich PA 144, 144); Rhode Island in 1893 (Act of May 3, 1893, ch. 1180, § 1, 1893 R.I. Pub. Laws 231, 231); South Carolina in 1897 (Act of Feb. 17, 1897, No. 251, § 1, 1897 S.C. Acts 423, 423); Illinois revision of municipal charter of Bloomington allowing to regulate or prohibit concealed carry in 1867 (Act of Mar. 7, 1867, ch. 6, § 1 (38), 1867 Ill. Laws 639, 650), while in 1845 and 1879 Illinois enacted restrictions on concealed carry creating a presumption that it was to commit an act against another (revised statutes of the state of Illinois 1874, at 453; Act of July 1, 1879); Georgia in 1898 (Act of Dec. 20, 1898, No. 106, 1898 Ga. Laws 60, 60); New York in 1866 and 1882 (Act of Apr. 20, 1866, ch. 716, § 2, 1866 N.Y. Laws 1523, 1523; Act of May 1, 1882, tit. 12, § 409, 1881 N.Y. Laws 1, 102 (1882)); and South Carolina in 1880 (Act of Dec. 24, 1880, No. 362, § 1, 1880 S.C. Acts 447, 447-48).

Aside from concealed carry prohibitions, other states either prohibited possession for adults (Illinois in 1881, see 1881 Ill Laws 71), or for minors (Kansas in 1883, see 1883 Kan Sess Laws 159), or had a no-carry law in general, as did Texas (1871 Tex Gen Laws 25), Arkansas (1874-75 Ark Acts 156), and West Virginia (1882 W Va Acts 421). During this same period, five states also banned sales of metallic knuckles. See 1868 Fla Laws 61, 95; 1881 N Y Laws 1, 102; 1881 Ark Acts 191, 192; Mass Pub Laws of 1881; and Minnesota Penal Code of 1886.

These laws reveal two points. First, they confirm that from approximately 1845 until the 1890s states enacted numerous prohibitions of varying types on metallic knuckles. As recounted above, most focused on precluding concealed carry, while others focused on sale bans or simple possession. But in all, during this pre-and-post Civil War time period, almost 25 jurisdictions had some type of restriction on the possession or sale of metallic knuckles. See also Kopel & Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 Journal of Legislation 223, 360-364 (2024). Second, these laws show that these jurisdictions considered metallic knuckles to be dangerous and unusual, and not used by law-abiding citizens for lawful purposes; instead, they were mainly used by the criminal element.

In analyzing these mid-to-late nineteenth century laws, we acknowledge that "because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Bruen*, 597 US at 36-37, quoting *Heller*, 554 US at 614. As Justice Barrett cautioned, *Bruen* "should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights." *Id*. at 83 (BARRETT, J., concurring). But at the same time, as in *Bruen*, "[a]lthough the historical record yields relatively few 18th- and 19th-century [laws] where weapons [metallic knuckles] were altogether prohibited . . . we are also aware of no disputes regarding the lawfulness of such prohibitions" and "[w]e therefore can assume it settled that these . . . arms . . . could be prohibited consistent with the Second Amendment." *Id*. at 30.

In other words, unless the absence of any known regulation on the possession of metallic knuckles in 1791 or in the recent years thereafter forecloses a conclusion that any subsequent ban is unconstitutional, a consistent Reconstruction Era history of regulating metallic knuckles

provides a sufficient historic basis to reach our decision today, as those laws provide an over-arching principle from the time at which the Second Amendment was (theoretically) made applicable to the States. See *Heller*, 554 US at 605 ("We now address how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century."); *Rahimi*, 602 US at 738 (BARRETT, J., concurring) ("In *Bruen*, the Court took history beyond the founding era, considering gun regulations that spanned the 19th century."); *Schoenthal v Raoul*, opinion of the United States District Court for the Northern District of Illinois, issued Aug. 30, 2024 (Case No. 3:22-cv-50326), p 15 ("As a result, this Court disagrees with Plaintiffs that *Bruen* mandates automatically writing off any law from the Reconstruction era. *Bruen* may have cautioned 'against giving post enactment history more weight than it can rightly bear,' but it also recognized that evidence of how the Second Amendment was interpreted 'through the end of the 19th century' can be a 'critical tool of constitutional interpretation.' ") (citation omitted). And, importantly, none of these mid-to-late nineteenth century laws contradict any laws from 1791. See *Bruen*, 597 US at 66 ("As we suggested in *Heller*, however, late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence.").

Indeed, these laws are *consistent* with colonial period laws that criminalized the public carrying of dangerous and unusual weapons, as that activity caused affrays and fear amongst the public. This can be seen in the laws and cases cited by *Heller* itself. In recounting that regulation of dangerous and unusual weapons has occurred since our nation's founding (and therefore consistent with the Second Amendment), the *Heller* Court cited to numerous legal sources recognizing the commonality of these regulations in both England and during the formative years of this country. See *Heller*, 554 US at 627, citing 4 Blackstone 148–149 (1769) ("The offense of riding or going armed, with dangerous and unusual weapons, is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by the statute of Northhampton, 2 Edw. III. c. 3. upon pain of forfeiture of the arms . . . ."); 3 B. Wilson, Works of the Honourable James Wilson 79 (1804); J. Dunlap, The New–York Justice 8 (1815); C. Humphreys, A Compendium of the Common Law in Force in Kentucky 482 (1822) (stating that riding or going armed with dangerous or unusual weapons was a crime against the public and was prohibited by statutes relating to concealed weapons); 1 W. Russell, A Treatise on Crimes and Indictable Misdemeanors 271–272 (1831) (recognizing that an unlawful "affray" can occur without actual violence when a person is armed with a dangerous or unusual weapon that causes terror to people); H. Stephen, Summary of the Criminal Law 48 (1840); E. Lewis, An Abridgment of the Criminal Law of the United States 64 (1847); F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852) (making same point about unlawful affrays from carrying a dangerous or unusual weapon, and that the common law and statutes long forbade such conduct); *State v Langford*, 10 NC 381, 383-384 (1824) ("[I]t seems certain there may be an affray when there is no actual violence: as when a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people; which is said always to have been an offence at common law, and is strictly prohibited by statute.") (quotation marks and citation omitted); *O'Neill v State*, 16 Ala 65, 67 (1849) ("It is probable, however, that if persons arm themselves with deadly or unusual weapons for the purpose of an affray, and in such manner as to strike terror to the people, they may be guilty of this offence, without coming to actual blows."); *English v State*, 35 Tex at 476 (1871) (citing to Blackstone's discussion of affrays and dangerous and unusual weapons, and finding that weapons such as brass knuckles receive no protection); and *State v Lanier*, 71 NC 288, 289 (1874).

These authorities provide the foundation for the previously cited mid-to-late nineteenth century bans on concealed carry of brass knuckles, which was carried forward to the prohibition in our current statute. As at least one court recognized, "[t]he fact that Founding-era laws singled out dangerous and unusual weapons for differential treatment without banning the weapons is, therefore, non-dispositive. Rather, that tradition developed, such that by the Reconstruction-era, the tradition encompassed possession bans." *Rupp v Bonta*, 723 F Supp 3d 837, 878 (CD Cal, 2024). See also *Price*, 111 F4th at 431-432 (RICHARDSON, J., dissenting) ("The relevant nineteenth-century cases that undergird the dangerous-and-unusual tradition also addressed statutes that prohibited the possession or carry of classes of weapons defined by functional—not nonfunctional—characteristics. These cases then determined whether the proscribed class of weapons was dangerous and unusual by assessing whether that class of weapons was particularly useful for unlawful purposes (dangerous) and whether it was uncommon for lawful purposes (unusual). Putting this all together, we see that history and tradition permit the government to ban the possession or carry of certain classes of weapon, as defined by their shared *functional* features, if those classes are dangerous and unusual.") (citations omitted).

More to the point, these laws and the decisions interpreting them set out a guiding historic principle that appears uniform amongst a majority of States: brass knuckles are dangerous and unusual weapons that have not, from 1791 through the post-Civil War era, played a role in the defense of self or others. As two esteemed academics recently noted, this long-held characterization of weapons like brass knuckles as dangerous and unusual with no connection to lawful uses, causes them to fall outside the protection of the Second Amendment:

> Because of courts' exclusive focus on individual self-defense against crime, the opposite problem is happening in other courts. Many courts are finding that various weapons are constitutionally protected despite being dangerous concealable weapons with no public-defense value. Some courts have invalidated bans on switchblade knives, dirk knives, butterfly knives, and nunchucks. A district court, for example, found that "[t]he centuries-old history of nunchaku being used as defensive weapons strongly suggests their possession, like the possession of firearms, is at the core of the Second Amendment."

> A general-law approach would make quick work of these cases. The same law that would find assault weapons within the core of the right to keep and bear arms would exclude these weapons. These weapons "belong to no military vocabulary"; they are not arms useful for public defense. Nor are these weapons "appropriate for open and manly use in self-defense," as are shotguns and similar firearms. The general law did not afford constitutional protection to small, dangerous weapons primarily designed as concealed weapons. While one can find a few outlier decisions to the contrary, the great weight of authority holds that such weapons are not "arms" within the meaning of the Second Amendment. [William Baude & Robert Leider, *The General-Law Right to Bear Arms*, 99 Notre Dame L Rev 1467, 1503 (2024) (citations omitted; alteration in original)].

On this record, we conclude that defendant's facial challenge to MCL 750.224(1)(d)'s prohibition of possessing metallic knuckles, fails. This holds true because there is an application of the statute that is constitutional under the Second Amendment: MCL 750.224(1)(d)'s ban on

the possession of metallic knuckles falls within the historical tradition of prohibiting the concealed carry of metallic knuckles as a dangerous and unusual weapon. See *Heller*, 554 US at 627. Certainly, possession under MCL 750.224(1)(d) includes concealed carry, *Brown*, 253 Mich at 539, and the history outlined above reflects a significant historic tradition of states banning that activity. As a result, defendant cannot prevail on his facial challenge, because the statute is not unconstitutional in all applications. *Bonner v City of Brighton*, 495 Mich 209, 223; 848 NW2d 380 (2014) ("[I]f any state of facts reasonably can be conceived that would sustain [the ordinance], the existence of the state of facts at the time the law was enacted must be assumed and the ordinance upheld.") (citations omitted; alteration in original).

Affirmed.

/s/ Christopher M. Murray
/s/ Mark T. Boonstra
/s/ Thomas C. Cameron